JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

RIDEWAY EXPRESS, INC

**(b)** County of Residence of First Listed Plaintiff  **Bucks**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Leonard Zoftis, Velter Yurovsky Zoftis Sokolson, LLC
1111 Street Rd., Suite 305, Southhampton, PA 18966;
Tel. 215-969-3004 ⊞

## DEFENDANTS

HAWKEYE TRANSPORTATION, LLC,
HAWKEYE TRANSPORTATION SERVICES, INC. ⊞

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane      **PERSONAL INJURY** | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability  ☐ 365 Personal Injury - Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander  ☐ 367 Health Care/ Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine  ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle      **PERSONAL PROPERTY** | **LABOR** | ☒ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability  ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal  ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | Injury  ☐ 380 Other Personal Property Damage | | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice  ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | |
| | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | **FEDERAL TAX SUITS** | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | ☐ 950 Constitutionality of State Statutes |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | |
| | | ☐ 555 Prison Condition | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §1125(a)

Brief description of cause:
Lanham Act, Defamation, Commercial Disparagement, Tortious Interference with Business Relations, Breach of Contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 4/21/25 | /s/ Leonard Zoftis |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

**RIDEWAY EXPRESS, INC.,**
**a Wyoming corporation,**

        **Plaintiff,**

**v.**                                            **Case No.**
                                                **JURY TRIAL DEMANDED**

**HAWKEYE TRANSPORTATION, LLC,**
**an Iowa company, and**
**HAWKEYE TRANSPORTATION**
**SERVICES, INC.,**
**an Iowa corporation,**

        **Defendants.**

_____/

## COMPLAINT

Plaintiff Rideway Express, Inc. ("Rideway"), for its Complaint against Defendants Hawkeye Transportation, LLC and Hawkeye Transportation Services, Inc., allege as follows:

### PARTIES

1.      Plaintiff Rideway Express, Inc. ("Rideway") is a Wyoming corporation with a principal place of business in this judicial district at 1300 Industrial Blvd, Suite 202, Southampton, PA 18966. At all relevant times, Rideway was an active, licensed motor carrier that hauled freight for Defendants under a written agreement.

2.      Defendant Hawkeye Transportation Services, Inc., is upon information and belief, an Iowa company with its principal place of business at 16 2nd Ave. SW,

Aberdeen, SD, 57401. Upon information and belief, Hawkeye Transportation Services, Inc. is a freight broker company that promotes itself as coordinating "a reliable, responsive fleet of trucks and provides high quality cost efficient transportation solutions to both regional and national markets."

3.      Defendant Hawkeye Transportation, LLC, is, upon information and belief, an Iowa company with its principal place of business at 119 Morris Ave., Evansdale, IA, 50707. Hawkeye Transportation, LLC promotes itself as a Hawkeye as a "trucking arm with our own fleet of trucks and qualified company driver."

4.      Upon information and belief, Defendants jointly operate both as a motor carrier and as freight broker business ("Hawkeye Transportation"), sometimes transporting goods for third parties as a motor carrier, and other times arranging for the transportation of goods by third party motor carriers such as Rideway. Defendants promote themselves as a singular business operation with both freight brokering/logistics and drivers: "Hawkeye's employees and company drivers all embody the company values and deliver quality, honest logistics services."

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 under the Lanham Act, as well as under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      This Court has personal jurisdiction over Defendants because, upon information and belief, Defendants transact business in this district by engaging motor

carriers (including Rideway) based here to haul loads. Moreover, the target of Defendants' defamatory statements and false advertising is Rideway, and the harm to Rideway's business and reputation was felt here.

7.    Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within this district and Rideway's principal place of business is located here, and because Defendants are subject to personal jurisdiction by virtue of the actions directed towards and harm suffered by Rideway in this state and district, as set forth in more detail herein.

## STATEMENT OF FACTS
### The Broker-Carrier Agreement

8.    On or about January 28, 2025, Rideway and Hawkeye entered into a written Broker–Carrier Agreement to govern their business relationship. Rideway, as a motor carrier, agreed to haul freight arranged by Hawkeye (as a freight broker) under the terms of this Agreement. A true and correct copy of the Agreement is attached as Exhibit A and incorporated by reference.

9.    Section 2D of the Agreement explicitly requires that Hawkeye will pay Rideway "within 21 days from Hawkeye Transportation Services' receipt of your invoice and Bill of Lading/Proof of Delivery."

10.    Rideway fully performed its obligations under the Agreement at all relevant times, delivered the shipments safely and in accordance with instructions, and promptly provided Hawkeye with the required invoices and Bills of Lading/Proof of

3

Delivery for two loads. With each load, Hawkeye failed to timely pay Rideway within 21 days.

11.     In particular, on or about January 31, 2025, Rideway completed delivery of a load for Defendants and promptly submitted its invoice and proof of delivery documentation to Hawkeye on that date (or immediately thereafter). However, Hawkeye did not send the final payment for this load within 21 days of receipt of the invoice and proof of delivery. Instead, payment was not delivered until thirty five (35) days later on March 6, 2025.

12.     Similarly, on or about March 17, 2025, Rideway completed delivery of a load for Defendants and promptly submitted its invoice and proof of delivery documentation to Hawkeye on that date (or immediately thereafter). However, Hawkeye did not send the final payment for this load within 21 days of receipt of the invoice and proof of delivery. Instead, payment has yet to be received.

13.     A representative of Rideway reached out after 21 days to demand payment, but Hawkeye admitted they always pay NET 30. Given the statement of Hawkeye's, it is likely there are numerous other carriers in a similar factual scenario as Rideway, e.g. Hawkeye failed to remit payment for completed loads within the contractual time specified of 21 days. The exact number of other carriers who were likewise paid in breach of the same contractual terms is unknown to Plaintiff at this time, but is believed to be in the hundreds or thousands, and can likely be identified through Defendants' records.

14.     Timely payment is a material term of the Agreement and is critical to Rideway's business. Motor carriers like Rideway rely on prompt payment to maintain cash flow, pay drivers, and cover operating expenses. Defendants were well aware that failing to pay within 21 days would harm Rideway by depriving it of the use of funds and forcing it to expend additional resources in payment collection efforts. By agreeing to the 21-day term, Defendants acknowledged the importance of prompt payment to Rideway and other carriers.

15.     Hawkeye's routine and wanton disregard for the payment terms of an Agreement it authored is a repudiation of terms of the Agreement detrimental to Hawkeye but beneficial to carriers.

## False FreightGuard Report Filed by Hawkeye

16.     "FreightGuard" is an industry reporting system (published to both the MyCarrierPortal and Carrier411 platforms, as well as other similar platforms) where brokers can file reports about motor carriers concerning their performance or conduct. These reports are visible to other brokers, shippers, and industry participants. A negative FreightGuard report can severely damage a carrier's reputation and ability to obtain new business, as brokers often refuse to tender loads to carriers with egregious reports.

17.     On or about March 26, 2025, Defendants, acting through their agent Miguel Munoz, submitted a FreightGuard report against Rideway for publication on both the Carrier411 and MyCarrierPortal platforms (Report on MC1652028). Rideway received notice of each report on the same date. A true copy of Hawkeye's FreightGuard reports are attached as Exhibit B. In those reports, Hawkeye falsely accused Rideway of

serious misconduct, including: "Unauthorized re-brokering of a shipment," "Fraudulent activity," and "Unethical or deceptive business practices." The reports specifically alleged that Rideway had "double brokered the load" that it booked from Hawkeye, and implied that Rideway's actions resulted in a truck driver being underpaid by approximately $1,100.

18.     Each of the accusations in Hawkeye's reports is false. Rideway never engaged in re-brokering of the Hawkeye load in question (which had been tendered on or about January 29, 2025). In reality, the load was carried to completion under Rideway's own authority and supervision, not re-brokered to any other carrier. Rideway did not commit any fraudulent or unethical act in relation to that load or any other load from Hawkeye. The statement that Rideway "double brokered" the shipment is entirely baseless and false.

19.     Specifically, a page of the Bill of Lading for the January 29 load (attached as part of Exhibit C), which is signed by the driver, lists Rideway as the carrier of record, confirming that the shipment was handled by Rideway and not transferred or re-brokered to another carrier. Rideway's internal records and communications, which were provided to Hawkeye, further demonstrated that the driver and equipment used were under Rideway's authority, negating any suggestion of an unauthorized re-broker.

20.     Hawkeye made these accusations either knowing they were false or with reckless disregard for the truth. By the time Hawkeye filed the FreightGuard report on March 26, 2025, it had in its possession documentation proving Rideway's proper handling of the load under Rideway's authority without re-brokering. In fact, on January

6

31, 2025, Rideway sent Hawkeye the delivery paperwork (including the Bill of Lading) which clearly identified Rideway as the carrier. This is the document Hawkeye itself relied on in issuing (late) payment to Rideway, and therefore cannot dispute its knowledge of the true facts prior to its Freightguard report.

21.     On March 26, 2025 (within hours of discovering the report), Rideway emailed Hawkeye extensive documentation refuting the allegations, including driver onboarding records, contracts, and compliance documents demonstrating that the driver was operating under Rideway's authority (see email without referenced attachments at Exhibit D). Thus, Hawkeye had indisputable proof that its statements were false, yet proceeded to publish (and maintain) the defamatory report. This conduct demonstrates malice or at least gross negligence by Hawkeye in making the false report.

22.     Upon information and belief, Hawkeye's false FreightGuard report was not a good-faith mistake, but rather was issued in bad faith. The timing and content of the report suggest that Hawkeye intended to punish Rideway, smear Rideway's business reputation. Regardless of motive, the statements published were false and unjustified.

23.     Hawkeye's false FreightGuard report was accessible to countless brokers, shippers, and industry participants who use the MyCarrierPortal platform (or other similar platforms). The false allegations (re-brokering, fraud, unethical conduct) are of the most egregious kind that constitute defamation per se in the trucking industry – they accuse Rideway of serious breaches of trust and law in its business. As a direct result of the report, Rideway's reputation suffered severe damage. Multiple brokers and potential business partners became aware of the report, and several brokers refused to offer loads

or opportunities to Rideway upon seeing the negative report, expressly citing the false report as the basis to deny a business opportunity to Rideway. The harm to Rideway was not just theoretical: Rideway lost business opportunities and income because other companies, relying on the false statements, refused to transact with Rideway. Specifically, multiple brokers refused to offer freight opportunities based expressly on the false Freightguard report. Importantly, there were no outstanding Freightguard reports available on Rideway other than the false report published by Hawkeye. These losses are continuing and are difficult to fully quantify, as the stigma of the report remains.

24.     After Rideway presented clear evidence of the falsity of the allegations on March 26, 2025, Hawkeye effectively admitted the report was unwarranted. During a call with Hawkeye's representative (Mike Fitzgerald), he admitted that Freightguard reports are devastating to carriers such as Rideway. Mr. Fitzgerald followed up via email stating that the report would be taken down. (Exhibit E: "He is taking it down.") However, Hawkeye failed to promptly remove or retract the report. Days passed and the defamatory report remained live on the MyCarrierPortal platform. Rideway sent further urgent requests on April 4, 2025, noting that the "unfounded freightguard [report] still shows" and imploring Hawkeye to remove it (Exhibit F). The false Freightguard report was not removed from the MyCarrierPortal platform until April 8, 2025, and only then after demands from counsel for Rideway. Hawkeye's refusal or inability to effectuate a timely retraction for nearly two weeks only served to aggravate the harm to Rideway and underscores Hawkeye's bad faith in this matter.

25.    The publication of the false FreightGuard report caused Rideway substantial damages, including but not limited to: loss of current and prospective business contracts, lost profits, damage to business reputation and goodwill, and out-of-pocket expenses to mitigate the harm. Rideway also suffered disruption to its operations as it had to divert time and resources to address the fallout from Hawkeye's actions. Because the statements impugn Rideway's trustworthiness and legality in its trade, they are considered defamatory per se

26.    By falsely branding Rideway as a dishonest actor in the industry, Hawkeye severely interfered with Rideway's business and shall continue to have a long-lasting negative impact on Rideway's otherwise stellar reputation.

27.    All conditions precedent to Rideway's claims (if any) have been satisfied, excused, or waived.

## COUNT I
## DEFAMATION PER SE

28.    Rideway incorporates and realleges the allegations of paragraphs 1 through 27 above as if fully set forth herein.

29.    Defendants published false statements of fact about Rideway, specifically the written assertions in the March 26, 2025, FreightGuard report that Rideway engaged in "Unauthorized re-brokering of a shipment," committed "Fraudulent activity," engaged in "Unethical or deceptive business practices," and "double brokered the load" in question. These statements were factual in nature (alleging specific misconduct) and were false. In truth, Rideway did not re-broker the load or commit any fraud or unethical act,

9

and Defendants had no factual basis for claiming otherwise. These statements were made with the knowledge that Rideway's principal office is in Pennsylvania, published in a manner in which they were available to residents of Pennsylvania, and therefore directed towards Pennsylvania.

30.    Defendants' false statements were separate and distinct from the parties' contract and were unrelated to the duties and obligations of any party to the contract.

31.    Defendants' false statements were published to numerous third parties. By posting the report on the Carrier411/MyCarrierPortal platforms (and other analogous platforms), Defendants made the statements available to an entire network of brokers, shippers, and other industry participants who subscribe to or access that system. Thus, the defamatory statements were communicated to the public within the trucking and logistics community.

32.    Defendants made these defamatory statements with actual malice, and certainly with negligence. Defendants either knew the statements were false or acted with reckless disregard for the truth. Defendants had received clear documentation from Rideway both before and after the initial publication proving that the load was handled under Rideway's authority (and not double brokered), and even acknowledged the report should be removed, yet they persisted in publishing the accusations. Such conduct evidences a willful indifference to Rideway's rights and a high degree of awareness of probable falsity.

33.    The false statements made by Defendants constitute defamation per se under applicable law because they ascribe to Rideway conduct that is incompatible with

the proper exercise of its business, trade, or profession. Accusations of fraud, dishonesty, and illegal re-brokering directly impugn Rideway's business integrity and are of the kind that would naturally harm a business's reputation. Therefore, injury to Rideway's reputation and goodwill is presumed, and Rideway is entitled to general damages without specific proof of loss.

34.     Regardless of whether damages are presumed, as a proximate result of Defendants' defamatory statements, Rideway has suffered significant damages, including but not limited to loss of business opportunities, decline in carrier rankings and credibility among brokers, and injury to its reputation and relationships in the industry. In addition to presumed general damages, Rideway has incurred special damages in the form of lost revenue and profits from brokers/clients who, upon learning of the false report, ceased or curtailed doing business with Rideway. Rideway has also had to spend time and money responding to the defamation (such as by explaining to business partners that the report is false and pursuing legal redress).

35.     Defendants' conduct was willful, wanton, and malicious, or at minimum showed a reckless disregard for the truth and for Rideway's rights. Defendants chose to publish and maintain grave accusations they knew to be false, potentially to gain leverage or harm Rideway. Such egregious conduct warrants the imposition of punitive damages to punish Defendants and deter them and others from similar defamation in the future.

36.     Rideway has suffered and continues to suffer irreparable harm that cannot be fully remedied by money damages alone, as the false statements have resulted in Rideway being blacklisted and/or removed from approved carrier lists, which continues

11

to poison Rideway's reputation. Rideway is therefore also entitled to injunctive relief prohibiting Defendants from publishing the defamatory statements and to cease publishing any further false statements about Rideway.

37.    WHEREFORE, Rideway demands judgment in its favor and against Defendants on Count I for defamation, including an award of compensatory damages (in an amount to be determined at trial), presumed damages for defamation per se, punitive damages, injunctive relief as appropriate, costs and all such other relief as the Court deems just and proper.

## COUNT II
## COMMERCIAL DISPARAGEMENT

38.    Rideway re-alleges paragraphs 1 through 37 above as if fully set forth herein.

39.    Defendants published false statements that disparage Rideway's business, services, and integrity, specifically claiming that Rideway engaged in improper and fraudulent business practices (double-brokering, etc.). These statements, detailed in the FreightGuard report, cast doubt on the quality, reliability, and legality of Rideway's services.

40.    Defendants' false statements were separate and distinct from the parties' contract and were unrelated to the duties and obligations of any party to the contract.

41.    Defendants knew, or reasonably should have known, that these disparaging statements were false. As stated, Rideway provided proof to Defendants that the load in question was handled appropriately and that no re-brokering occurred. No

competent evidence ever suggested that Rideway committed the misconduct alleged; thus Defendants had no reasonable ground to believe their statements were true. Publishing them regardless was at least reckless.

42.    Defendants made and maintained these false statements with the intent to cause harm to Rideway's economic interests, or with reckless disregard for the consequences. By filing a negative report on a public carrier forum, Defendants either intended to punish Rideway or knew it would likely result in Rideway losing business from other brokers. Such an action was not accidental – it was a deliberate act that Defendants knew would interfere with Rideway's trade relationships. Defendants, which also operate as a motor carrier, offer competing services and stand to benefit from the reputational harm of a competitor.

43.    As a direct and proximate result of Defendants' injurious falsehoods, Rideway suffered pecuniary losses. Specifically, Rideway lost specific load opportunities and contracts that can be identified: for example, at least one brokerage that Rideway sought to obtain freight declined load offers after the false report became known, resulting in identifiable lost revenue to Rideway. Additionally, it is likely that Riseway's standing in broker databases was downgraded, which has a continuing effect of reducing its income. These are direct financial harms caused by the disparagement.

44.    In addition to specific lost deals, the publication of the false allegations has broadly damaged Rideway's reputation in the marketplace, making others hesitant to work with Rideway.

45.    Defendants' conduct in publishing the false report was malicious. It is highly improper in the transportation industry for a broker to levy a baseless FreightGuard claim against a carrier without justification; doing so can ruin a carrier's business. Defendants either maliciously sought to ruin Rideway's business or acted so recklessly as to evince a wanton disregard for Rideway's rights. This entitles Rideway to punitive or exemplary damages on this count as well, for the purpose of punishment and deterrence. If filing Freightguards is a typical business practice of Hawkeye, it is likely there are numerous other carriers in a similar factual scenario as Rideway, e.g. Hawkeye filed other false Freightguards. The exact number of other carriers who were likewise defamed is unknown to Plaintiff at this time, but it can likely be identified through Defendants' records.

46.    WHEREFORE, Rideway demands judgment in its favor on Count II for commercial disparagement, awarding Rideway its actual pecuniary damages in an amount to be proven, plus punitive damages, interest as allowed by law, costs and such other relief as the Court deems just and proper.

## COUNT III
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

47.    Rideway re-alleges paragraphs 1 through 46 above as if fully set forth herein.

48.    At the time Defendants published the false FreightGuard report, Rideway had existing business relationships with various brokers and shippers, as well as prospective relationships and expectancies in obtaining new freight opportunities.

Rideway regularly contracts with freight brokers in the industry, and its continued success depends on maintaining a good reputation to secure loads from those brokers. For example, Rideway had a business opportunity with Traffic Tech Inc. (out of Ontario) and others who review Freightguards and deny freight to carriers with Freightguards. The opportunity with Traffic Tech was last as a result of the false Freightguard published by Hawkeye

49.    Defendants' false statements were separate and distinct from the parties' contract and were unrelated to the duties and obligations of any party to the contract.

50.    Defendants knew Rideway had relationships with other freight brokers within the industry. As a broker itself, Hawkeye was well aware that Rideway would be seeking freight from other brokers and that a negative Freightguard report would be seen by those entities. Indeed, Defendants' representative acknowledged on a call with Rideway that a Freightguard report was devastating to Rideway's prospects. Defendants intended or understood that their actions would influence how other brokers view and treat Rideway and impact Rideway financially.

51.    By publishing a false and inflammatory FreightGuard report, Defendants intentionally and unjustifiably interfered with Rideway's business relationships. Defendants' actions were calculated to (or had the natural and probable consequence to) induce or cause third parties to refrain from doing business with Rideway. The content of the report was so egregious (alleging fraud and unethical conduct) that any reasonable third party would pause or cease engaging Rideway upon seeing it. Defendants either desired this result (for example, to retaliate against Rideway or to gain a competitive edge

for Defendants' carrier operations) or knew that such interference was certain or substantially certain to occur.

52. Defendants had no legitimate justification or privilege for this interference. The allegations they made were false and not made to protect any legitimate interest, but rather were made in bad faith. Even if Defendants had a business grievance with Rideway (such as a disputed payment or performance issue), filing a false public report was not a reasonable or truthful way to address it. Defendants' conduct violated industry norms and was not protected by any privilege (in fact, filing a knowingly false report is an act of bad faith outside any proper business privilege).

53. As a direct result of Defendants' interference, one or more third parties did in fact alter, terminate or refuse to conduct their business relationship with Rideway. Specifically, after the report's publication, at least Traffic Tech Inc. denied Rideway freight, explicitly citing the Freightguard report as the reason. Other brokers stopped offering new loads to Rideway, causing a measurable decline in Rideway's freight volume. This constitutes actual damage to Rideway's business relationships and expectancies that were likely to succeed but for Defendants' interference.

54. Rideway has suffered damages as a result of the lost and impaired business relationships, including lost revenue and profits from the loads it was not awarded, as well as the long-term loss of client trust. Rideway estimates that, in the weeks following the report, Rideway lost thousands of dollars in income directly attributable to the false Freightguard report. For some brokers, once they have received the Freightguard,

Rideway will be removed from their approved list, and they may not restore Rideway even once the false Freightguard is removed.

55.     Defendants' interference was accompanied by malice and wrongful intent, as evidenced by their knowingly false statements. During discussions with Defendants, they produced a screenshot showing they filed multiple Freightguards against various carriers, suggesting Defendants routinely file Freightguards despite knowing how damaging such reports are to a carrier. For their knowing and egregious conduct, Rideway is entitled to punitive damages on this claim as well, to punish Defendants for their intentional, bad-faith interference with Rideway's business.

**56.**     WHEREFORE, Rideway demands judgment in its favor on Count III for tortious interference, including an award of all compensatory damages resulting from lost and impaired business relationships, punitive damages, costs and such other and further relief as the Court deems just and proper.

## COUNT IV
## BREACH OF CONTRACT

57.     Rideway re-alleges paragraphs 1 through 56 above as if fully set forth herein.

58.     Under the Broker–Carrier Agreement (Exhibit A), Defendants expressly agreed to pay Rideway for its services within 21 days of Defendants' receipt of Rideway's invoice and proof of delivery for each load. This 21-day payment provision was a fundamental term of the Agreement and a material inducement for Rideway to enter the contract and haul loads for Defendants.

17

59.     For each load that Rideway hauled for Defendants, Rideway duly performed by delivering the load and then submitting an invoice along with the required Bill of Lading/Proof of Delivery to Defendants. Rideway satisfied all conditions required to trigger Defendants' payment obligation on each such load, and no valid dispute existed that would excuse or extend Defendants' duty to pay within the agreed timeframe.

60.     Defendants failed to pay within 21 days on all occasions, breaching the Agreement repeatedly. Specifically, for each load hauled by Rideway, Defendants did not issue final payment until well after the 21-day period had elapsed. Each such late payment constitutes a separate breach of the Agreement's payment terms by Defendants.

61.     Defendants' failure to pay on time is their standard business practice, and Defendants likely fail to comply with the terms they defined with each and every carrier under contract with Defendants. Each such motor carrier would share common questions of fact and law with Rideway, and the types of damages suffered by Rideway are common to all motor carriers that have entered the same form contract with Defendants. The full extent of Defendants' improper conduct will only be learned through discovery.

62.     Defendants had no contractual or legal justification for these payment delays. The Agreement's terms did not provide for extending payment beyond 21 days except possibly in cases of a bona fide freight claim or severe service failure by the carrier. Here, there were no legitimate freight claims or service failures on Rideway's part that would excuse timely payment. Defendants' late payments were a result of Defendants' own practices or decisions (such as cash-flow management or neglect), not any breach by Rideway. Even if Defendants believed (wrongly) that Rideway had

breached some duty (e.g. the false re-brokering accusation), that belief was not a valid ground under the Agreement to withhold timely payment, especially absent any actual loss or claim filed.

63.    Defendants' failure to pay within 21 days as promised is a material breach of the Agreement. Timeliness of payment is of the essence in motor carrier agreements; carriers depend on prompt payment to sustain operations. Defendants' repeated breaches deprived Rideway of the benefit of its bargain (prompt compensation) and caused Rideway financial harm, as described below.

64.    As a direct result of Defendants' breaches of the payment term, Rideway suffered damages including lost use of funds, administrative expenses, and damaging both Rideway's borrowing ability and its ability to negotiate financing. Rideway is entitled to recover as damages the amount of any interest or financing charges it incurred due to Defendants' late payments and any other consequential losses caused by the delay. At minimum, Rideway is entitled to statutory prejudgment interest on the late-paid amounts, calculated from the date each payment became overdue (the 22nd day after Defendants' receipt of the invoice/POD) to the date payment was ultimately made (or to the present for any still-unpaid amounts).

65.    Given the pattern of late payments, Rideway pleads in the alternative that Defendants' conduct amounted to an ongoing, systemic breach of the Agreement's payment provisions. This systemic failure goes to the essence of the contract and undermines Rideway's confidence in Defendants' future performance. As such, Rideway has been damaged not only by past late payments but also has justifiable concern that,

absent intervention, any future dealings would likewise result in breach. Rideway reserves the right to assert that Defendants' pattern of noncompliance constitutes an anticipatory repudiation of the Agreement's payment obligations, entitling Rideway to terminate the contract and seek full damages.

66.    WHEREFORE, Rideway demands judgment in its favor on Count IV for breach of contract (failure to pay within 21 days), awarding Rideway all sums due and owing for the loads it hauled (to the extent not already paid), plus compensatory damages for losses caused by the delayed payments, prejudgment interest, attorneys' fees and costs pursuant to the terms of the contract, and any other relief the Court deems just and proper to compensate Rideway and to enforce the payment terms of the Agreement.

**COUNT V**
**LANHAM ACT 15 U.S.C. §1125(a)**

67.    Rideway re-alleges and incorporates by reference paragraphs 1 through 66 as if fully set forth herein.

68.    Defendants have made commercial statements regarding Rideway that were false and/or misleading, and which deceived, or had the capacity to deceive, consumers. In particular, Defendants made false statements on platforms routinely used by customers and vendors about Rideway's business, services, and integrity, specifically claiming that Rideway engaged in improper and fraudulent business practices (double-brokering, etc.).

69.     Defendants' false commercial statements were separate and distinct from the parties' contract and were unrelated to the duties and obligations of any party to the contract.

70.     Defendant's false and misleading statements were intended to and in fact had a material effect on influencing purchasing decisions of consumers in Pennsylvania and elsewhere, and which affect interstate commerce. Freight brokers, who are relevant in purchasers in this industry, specifically reported to Rideway that the false statements of Defendants in Freightguard reports

71.     Moreover, Defendants' operate as a carrier and therefore are in commercial competition with Rideway, and Rideway has been and is likely to continue to be injured as a result of Defendants' false advertising statements.

72.     Because Defendants' false advertising was with knowledge of both the falsity and the likely damage, this case is exceptional under the relevant statutes.

73.     WHEREFORE, Rideway demands judgment in its favor on Count V for false advertising, awarding Rideway its actual damages in an amount to be proven, finding the case exceptional and awarding treble damages and fees, interest as allowed by law, costs and such other relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

Wherefore, Rideway requests judgment as follows:

   a.   An Order finding Defendants liable for defamation, commercial disparagement, tortious interference with business relations, breach of contract and false advertising;

21

b.  Compensatory damages in an amount to be determined at trial;

c.  Punitive or enhanced damages as permitted by statute, equity, or otherwise;

d.  Additional damages permitted by leave of Court;

e.  A permanent injunction prohibiting breach, further use, or dissemination of false statements;

f.  Attorney's fees and costs as permitted by statute, equity, or otherwise; and

g.  Such other and further relief as this Honorable Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted April 21, 2025.

Leonard Zoftis
PA Bar No. 78620
lzoftis@vyzlaw.com
Velter Yurovsky Zoftis Sokolson, LLC
1111 Street Road, Suite 305
Southampton, PA 18966
Telephone:  215-969-3004
Facsimile:  215-364-4000

**EXHIBIT A**



# Signed Agreement Affidavit

**On behalf of RIDEWAY EXPRESS INC DBA RIDEWAY (DOT#: 4258880) with offices at 1300 INDUSTRIAL BLVD SUITE 202, SOUTHAMPTON, PA 18966, on 1/28/2025, Livia Taulean, Safety, agreed to Hawkeye Transportation Services, Inc.'s online agreement, version #: [GetCustomerAgreement-new.pdf 2021.04.21.14.29.35].**

Details: On 1/28/2025, Livia Taulean, Safety,  securely signed in to www.mycarrierpackets.com from IP Address 100.11.80.118:65472 at location Lat 40.2363, Long -75.296, method used: IP Address, using the confirmed and password protected username of ridewayexpress. During the carrier's online registration, Livia Taulean, Safety,  certified under penalty of perjury under the laws of the United States of America to having authorization by RIDEWAY EXPRESS INC DBA RIDEWAY to sign agreements on their behalf.

Email receipt of the signed agreement was sent to dot@ridewayexpress.com on 1/28/2025.

# Agreement Table of Content:

1. HOW WE PAY
2. BROKER - CARRIER AGREEMENT

# **HOW WE PAY**

**\*\*\* To be paid, paperwork can be sent to: accounting@HawkeyeTSI.com – Copies are accepted unless otherwise noted on rate confirmation.**

Hawkeye Transportation Services respects your need for prompt payment and offers the following payment options.

- **Standard Pay** – Final payment will be mailed to carrier or direct deposited within 21 days from Hawkeye Transportation Services receipt of your invoice and Bill of Lading/Proof of Delivery.

- **Quick Pay** – SAME DAY (1 DAY) Payment via CommCheck will be made same day as receipt of invoice and Bill of Lading/Proof of Delivery.    Fee is 3% of the balance owed on the agreed upon rate with a $25 minimum.

- **Fuel Advances** – Fuel advance payment of up to 40% of the agreed rate may be provided via CommCheck once the load has been picked up.    Fee is 3% of the fuel advance amount with a $25 minimum.
  The advance and fee will be deducted from the final settlement.

Terms and Conditions

1. Quick Pay, Fuel Advance, and/or Standard Pay options may not be available in the event of a freight claim or severe service failure on behalf of carrier.

2. Quick Pay, Fuel Advance, and/or Standard Pay options may be altered or discontinued by Hawkeye Transportation Services at any time without notice.    Hawkeye offers Quick Pay and Fuel Advances at its own discretion and may decline privileges at any time.

3. Hawkeye Transportation Services must have prior approval on file in order to Quick Pay or process Fuel Advances.    The easiest way to make sure this is done is to completely fill out the attached Carrier Profile at the time of initial setup.

**IN WITNESS WHEREOF, the Parties agree to be bound by the electronically exchanged signatures of their duly authorized representatives contained in the Signed BROKER - CARRIER AGREEMENT, and by doing so, represent and warrant that they accept and agree to the terms contained in this BROKER - CARRIER AGREEMENT and have been or are specifically authorized to execute**

the BROKER - CARRIER AGREEMENT on behalf of the organization they represent.

# BROKER - CARRIER AGREEMENT

**This AGREEMENT is entered into on the date specified via an online portal, MyCarrierPackets.com, evidenced by the Signed Agreement Affidavit between the registered carrier named on the Signed Agreement Affidavit ("CARRIER") and** HAWKEYE TRANSPORTATION SERVICES, INC. **("BROKER"), a Registered Property Broker, Lic. No. DOT/MC-2227468/402090"); collectively, the "Parties".    ("Registered" means operated under authority issued by the Federal Motor Carrier Safety Administration (or its predecessors) within the U.S. Department of Transportation).**

**1.    CARRIER REPRESENTS AND WARRANTS THAT IT:**

A.    Is a Registered Motor Carrier of Property authorized to provide transportation of property under contracts with shippers and receivers and/or brokers of general commodities.

B.    Shall transport the property, under its own operating authority and subject to the terms of this Agreement;

C.    Makes the representations herein for the purpose of inducing BROKER to enter into this Agreement.

D.    Agrees that a Shipper's insertion of BROKER's name as the carrier on a bill of lading shall be for the Shipper's convenience only and shall not change BROKER's status as a property broker nor CARRIER's status as a motor carrier. BROKER is not a motor carrier and assumes no motor carrier responsibility for cargo loss and damage in the event that the National Motor Freight Traffic Association (NMFTA) (effective in August 2016), form of bill of lading is utilized.

E.    Will not re-broker, co-broker, subcontract, assign, interline, or transfer the transportation of shipments hereunder to any other persons or entity conducting business under a different operating authority, without prior written consent of BROKER. If CARRIER breaches this provision, among all other remedies (whether at equity or in law), BROKER shall have the right of paying the monies it owes CARRIER directly to the delivering carrier, in lieu of payment to CARRIER. Upon BROKER's payment to delivering carrier, CARRIER shall not be released from any liability to BROKER under this Agreement or otherwise, including any claims under MAP-21 (49 U.S.C. § 13901 et seq.). In addition to the indemnity obligation in Par 1.H, CARRIER will be liable for consequential damages for violation of this provision.

F.    (i)    Is in, and shall maintain compliance during the term of this Agreement, with all applicable federal, state and local laws relating to the provision of its services including, but not limited to:    transportation of Hazardous Materials (including the licensing and training of Haz-Mat qualified drivers), as defined in 49 C.F.R. §172.800, §173, and §397 et seq. to the extent that any shipments hereunder constitute Hazardous Materials; security regulations; owner/operator lease regulations; loading and securement of freight regulations; implementation and maintenance of driver safety regulations including, but not limited to, hiring, controlled substances and alcohol testing, and hours of service regulations; sanitation, temperature, and contamination requirements for transporting food, perishable, and other products, including without limitation the Food Safety Modernization Act, the Sanitary Food Transportation Act of 2005 and the FDA's Final Rule pertaining to Sanitary Transportation of Human and Animal Food, qualification and licensing and training of drivers; implementation and maintenance of equipment safety regulations; maintenance and control of the means and method of transportation including, but not limited to, performance of its drivers; all applicable insurance laws and regulations including but not limited to workers' compensation. CARRIER agrees to provide proof of compliance upon request.

(ii) Is solely responsible for any and all management, governing, discipline, direction and control of its employees, owner/operators, and equipment with respect to operating within all applicable federal and state legal and regulatory requirements to ensure the safe operation of CARRIERS vehicles, drivers and facilities. CARRIER and BROKER agree that safe and legal operation of the CARRIER and its drivers shall completely and without question govern and supersede any service requests, demands, preferences, instructions, and information from BROKER or BROKER's customer with respect to any shipment at any time.

G.    CARRIER will notify BROKER immediately if its federal Operating Authority is revoked, suspended or rendered inactive for any reason; and/or if it is sold, or if there is a change in control of ownership, and/or any insurance required hereunder is threatened to be or is terminated, cancelled, suspended, or revoked for any reason.

H. CARRIER shall defend, indemnify and hold BROKER and its shipper customer harmless from any claims, actions or damages, arising out of its performance under this Agreement, including cargo loss and damage, theft, delay, damage to property, and personal injury or death. Neither Party shall be liable to the other for any claims, actions or damages due to the negligence or intentional act of the other Party, or the shipper. The obligation to defend shall include all costs of defense as they accrue.

I.    Does not have an "Unsatisfactory" safety rating issued by the Federal Motor Carrier Safety Administration (FMCSA), U.S. Department of Transportation, and will notify BROKER in writing immediately if its safety rating is changed to "Unsatisfactory" or "Conditional". Authorizes BROKER to invoice CARRIER's freight charges to shipper, consignee, or third parties responsible for payment.

J.    Has investigated, monitors, and agrees to conduct business hereunder based on the credit-worthiness of BROKER and is granting BROKER credit terms accordingly.

K.    On behalf of shipper, consignee and broker interests, to the extent that any shipments subject to this Agreement are transported within the State of California on refrigerated equipment, CARRIER warrants that it shall only utilize equipment which is in full compliance with the California Air Resources Board (CARB) Transport Refrigerated Unit (TRU) Airborne Toxic Control Measure (ATCM) in-use regulations. CARRIER shall be liable to BROKER for any penalties, or any other liability, imposed on, or assumed by BROKER due to penalties imposed on BROKERS customer because of CARRIER's use of non-compliant equipment.

## 2.    **BROKER RESPONSIBILITIES:**

A.    <u>SHIPMENTS, BILLING & RATES:</u>    BROKER shall offer CARRIER at least one (1) loads/shipments annually. BROKER shall inform CARRIER of (i) place of origin and destination of all shipments; and (ii) if applicable, any special shipping and handling instructions, special equipment requirements, or value of shipments in excess of the amount specified in Par. 3C(vi) below, of which BROKER has been timely notified.

B.    BROKER agrees to conduct all billing services to shippers, consignees, or other party responsible for payment.    CARRIER shall invoice BROKER for its (CARRIER's) charges, as mutually agreed in writing, by fax, or by electronic means, contained in BROKER's Load Confirmation Sheet(s) / dispatch sheets incorporated herein by this reference.    Additional rates for truckload or LTL shipments, or modifications or amendments of the above rates, or additional rates, may be established to meet changing market conditions, shipper requirements, BROKER requirements, and/or specific shipping schedules as mutually agreed upon, and shall be confirmed in writing (or by fax or email) by both Parties. Any such additional, modified, or amended rates, changes in rates shall automatically be incorporated herein by this reference.

C.    <u>RATES:</u>    Additionally, any rates, which may be verbally agreed upon, shall be deemed confirmed in writing where CARRIER has billed the agreed rate and BROKER has paid it. All written confirmations of rates, including confirmations by billing and payment, shall be incorporated herein by this reference. Rates or charges, including but not limited to stop-offs, detention, loading or unloading, fuel surcharges, or other accessorial charges, tariff rates, released rates or values, or tariff rules or circulars, shall only be valid when their terms are specifically agreed to in a writing signed by both Parties.

D.    PAYMENT:    The Parties agree that BROKER is the sole party responsible for payment of CARRIER's charges. Failure of BROKER to collect payment from its customer shall not exonerate BROKER of its obligation to pay CARRIER. BROKER agrees to pay CARRIER's invoice within __21__ days of receipt of the bill of lading or proof of delivery, provided CARRIER is not in default under the terms of this Agreement. If BROKER has not paid CARRIER's invoice as agreed, and CARRIER has complied with the terms of this Agreement, CARRIER may seek payment from the Shipper or other party responsible for payment after giving BROKER ____90__ (business days) advance written notice. CARRIER shall not seek payment from Shipper, consignees, or third parties, if they can prove payment to BROKER.

E.    BOND: BROKER shall maintain a surety bond /trust fund as agreed to in the amount of $_____75,000.00_____ and on file with the Federal Motor Carrier Safety Administration (FMCSA) in the form and amount not less than that required by that agency's regulations.

F.    BROKER will notify CARRIER immediately if its federal Operating Authority is revoked, suspended or rendered inactive for any reason; and/or if it is sold, or if there is a change in control of ownership, and/or any insurance required hereunder is threatened to be or is terminated, cancelled, suspended, or revoked for any reason.

G.    BROKER's responsibility is limited to arranging for, but not actually performing, transportation of a shipper's freight.

**3.    CARRIER RESPONSIBILITIES:**

A.    EQUIPMENT: Subject to its representations and warranties in Paragraph 1 above, CARRIER agrees to provide the necessary equipment and qualified personnel for completion of the transportation services required for BROKER and/or its customers. CARRIER will not supply equipment that has been used to transport hazardous wastes, solid or liquid, regardless of whether they meet the definition in 40 C.F.R. §261.1 et. seq. CARRIER will furnish equipment for transporting cargo which is sanitary, and free of any contamination, suitable for the particular commodity being transported and which will not cause in whole or in part adulteration of the commodity as defined in 21 U.S.C § 342. CARRIER agrees that all shipments will be transported and delivered with reasonable dispatch, or as otherwise agreed in writing.

B.    BILLS OF LADING: CARRIER shall sign a bill of lading, produced by shipper or CARRIER in compliance with 49 C.F.R. §373.101 (and any amendments thereto), for the property it receives for transportation under this Agreement. Unless otherwise agreed in writing, CARRIER shall become fully responsible/liable for the freight when it takes/receives possession thereof, and the trailer(s) is loaded, regardless of whether a bill of lading has been issued, and/or signed, and/or delivered to CARRIER, and which responsibility/liability shall continue until delivery of the shipment to the consignee and the consignee signs the bill of lading or delivery receipt. Any terms of the bill of lading (including but not limited to payment and credit terms, released rates or released value) inconsistent with the terms of this Agreement shall be ineffective.    Failure to issue a bill of lading, or sign a bill of lading acknowledging receipt of the cargo, by CARRIER, shall not affect the liability of CARRIER.

C.    LOSS & DAMAGE CLAIMS:
     (i)    CARRIER shall comply with 49 C.F.R. §370.1 et seq. and any amendments and/or any other applicable regulations adopted by the Federal Motor Carrier Safety Administration, U.S. Department of Transportation, or any applicable state regulatory agency, for processing all loss and damage claims and salvage. CARRIER agrees that food that has been transported or offered for transport under conditions that are not in compliance with Shipper's or BROKER'S instructions, as provided to CARRIER by Shipper or BROKER, will be considered "adulterated" within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 342 (i). CARRIER understands and agrees that adulterated shipments may be refused by the consignee or receiver, at destination without diminishing or affecting CARRIER'S liability in the event of a cargo claim.    CARRIER shall not sell, salvage or attempt to sell or salvage any goods without the BROKER's express written permission; and

     (ii)    CARRIER's liability for any cargo damage, loss, or theft from any cause shall be determined under the Carmack Amendment, 49 U.S.C. §14706 if applicable; however, liability for exempt commodities and processing cargo loss and damage claims shall be determined by: DRC Trading Practices, or Blue Book Transportation Guidelines, or NAPTWG Best Practices by agreement of

the Parties and if no agreement then by one of the above associations' guidelines named above at the selection of the BROKER. and

(iii)    Special Damages: CARRIER's indemnification liability (Par 1.H) for freight loss and damage claims under this sub-par C (ii) shall include legal fees which shall constitute special damages, the risk of which is expressly assumed by CARRIER, and which shall not be limited by any liability of CARRIER under Subp. (ii) above.

(iv)    Except as provided in Par 1.E above, neither Party shall be liable to the other for consequential damages without prior written notification of the risk of loss and its approximate financial amount, and agreement to assume such responsibility in writing.

(v)    Notwithstanding the terms of 49 CFR 370.9, CARRIER shall pay, decline or make settlement offer in writing on all cargo loss or damage claims within ___30___ days of receipt of the claim. Failure of CARRIER to pay, decline or offer settlement within this ___30___ day period shall be deemed admission by CARRIER of full liability for the amount claimed and a material breach of this Agreement.

(vi)    CARRIER's liability for cargo damage, loss, or theft from any cause for any one shipment, under Subp. ii above shall not exceed $__100,000.00_____unless CARRIER is notified by BROKER or Shipper of the increased value __3___ days prior to shipment pick up.

D.    INSURANCE: CARRIER shall furnish Assure Assist with Certificate(s) of Insurance, or insurance policies providing thirty (30) days advance written notice of cancellation or termination, and unless otherwise agreed, subject to the following minimum limits: General liability $1,000,000.00; motor vehicle (including hired and non-owned vehicles) $1,000,000.00, ($5,000,000 if transporting hazardous materials including environmental damages due to release or discharge of hazardous substances); cargo damage/loss, $100,000.00; workers' compensation with limits required by law.    Except for the higher coverage limits which may be specified above, the insurance policies shall comply with minimum requirements of the Federal Motor Carrier Safety Administration and any other applicable regulatory state agency. Nothing in this Agreement shall be construed to avoid or limit CARRIER's liability due to any exclusion or deductible in any insurance policy.

E.    ASSIGNMENT OF RIGHTS: CARRIER automatically assigns to BROKER all its rights to collect freight charges from Shipper or any responsible third party on receipt of payment of its freight charges from BROKER.

F.    CARRIER assumes full responsibility and liability for payment of the following items: All applicable federal, state, and local payroll taxes, taxes for unemployment insurance, old age pensions, workers' compensation, social security, with respect to persons engaged in the performance of its transportation services hereunder.    BROKER shall not be liable for any of the payroll-related tax obligations specified above and CARRIER shall indemnify, defend, and hold BROKER harmless from any claim or liability imposed or asserted against BROKER for any such obligations.


**4.    MISCELLANEOUS:**


A.    INDEPENDENT CONTRACTOR: The relationship of the Parties to each other shall at all times be that of independent contractors. None of the terms of this Agreement, or any act or omission of either Party shall be construed for any purpose to express or imply a joint venture, partnership, principal/agent, fiduciary, or employer/employee relationship between the Parties. Each Party shall provide sole supervisions and shall have exclusive control over the actions and operations of its employees, and agents used to perform its services hereunder. Neither Party has any right to control, discipline or direct the performance of any employees, or agents of the other Party. Neither Party shall represent to any party that it is anything other than an independent contractor in its relationship to the other Party.

B.    NON-EXCLUSIVE AGREEMENT: CARRIER and BROKER acknowledge and agree that this contract does not bind the respective Parties to exclusive services to each other. Either party may enter into similar agreements with other carriers, brokers, or freight forwarders.

C.    WAIVER OF PROVISIONS:

(i)     Failure of either Party to enforce a breach or waiver of any provision or term of this Agreement shall not be deemed to constitute a waiver of any subsequent failure or breach, and shall not affect or limit the right of either Party to thereafter enforce such a term or provision.

(ii)     This Agreement is for specified services pursuant to 49 U.S.C. §14101(b). To the extent that terms and conditions herein are inconsistent with Part (b), Subtitle IV, of Title 49 U.S.C. (ICC Termination Act of 1995), the Parties expressly waive any or all rights and remedies they may have under the Act.

D.     <u>DISPUTES</u>: In the event of a dispute arising out of this Agreement, including but not limited to Federal or State statutory claims, the Party's sole recourse (except as provided below) shall be to arbitration. Proceedings shall be conducted under the rules of the (select one): ___ American Arbitration Association (AAA), ___ Transportation ADR Council, Inc. (ADR), ___ DRC (Fruit and Vegetable Dispute Resolution Corp) for fresh produce related claims, upon mutual agreement of the Parties, or if no agreement, then at BROKER's sole discretion. Arbitration proceedings shall be started within eighteen (18) months from the date of delivery or scheduled date of delivery of the freight, whichever is later. Upon agreement of the Parties, arbitration proceedings may be conducted outside of the administrative control of the AAA, ADR, or DRC. The decision of the arbitrators shall be binding and final and the award of the arbitrator may be entered as judgment in any court of competent jurisdiction. The rationale and reasoning of the decision of arbitrator(s) shall be fully explained in a written opinion. The prevailing party shall be entitled to recovery of costs, expenses and reasonable attorney fees as well as those incurred in any action for injunctive relief, or in the event further legal action is taken to enforce the award of arbitrators. Arbitration proceedings shall be conducted at the office of the AAA, ADR, or DRC nearest   BROKER's address or such other place as mutually agreed upon in writing, or by conference call or video conferencing upon agreement of the Parties, or as directed by the acting arbitration association. Provided, however, either Party may apply to a court of competent jurisdiction for injunctive relief. Unless preempted or controlled by federal transportation law and regulations, the laws of the State of __IA____ shall be controlling notwithstanding applicable conflicts of laws rules. The arbitration provisions of this paragraph shall not apply to enforcement of the award of arbitration.

(iii)     (IF i AND/OR ii ARE ADOPTED, THEN iii MUST BE INCLUDED) Venue, controlling law, and jurisdiction in any legal proceedings under Subps. i or ii above shall be in the State of _____Iowa_____.

E.     <u>NO BACK SOLICITATION</u>:
(i)     Unless otherwise agreed in writing, CARRIER shall not knowingly solicit freight shipments (or accept shipments) for a period of ___12___ month(s) following termination of this agreement for any reason, from any shipper, consignor, consignee, or other customer of BROKER, when such shipments of shipper customers were first tendered to CARRIER by BROKER. (OPTIONAL)
(ii)     In the event of breach of this provision, BROKER shall be entitled, for a period of ____12_____ months following delivery of the last shipment transported by CARRIER under this Agreement, to a commission of 15 percent (_15____%) of the gross transportation revenue (as evidenced by freight bills) received by CARRIER for the transportation of said freight as liquidated damages. Additionally, BROKER may seek injunctive relief and in the event it is successful, CARRIER shall be liable for all costs and expenses incurred by BROKER, including, but not limited to, reasonable attorney's fees.

F.     <u>CONFIDENTIALITY</u>:
(i)     In addition to Confidential Information protected by law, statutory or otherwise, the Parties agree that all of their financial information and that of their customers, including but not limited to freight and brokerage rates, amounts received for brokerage services, amounts of freight charges collected, freight volume requirements, as well as personal customer information, customer shipping or other logistics requirements shared or learned between the Parties and their customers, shall be treated as Confidential, and shall not be disclosed or used for any reason without prior written consent.

(ii)     In the event of violation of this Confidentiality paragraph, the Parties agree that the remedy at law, including monetary damages, may be inadequate and that the Parties shall be entitled, in addition to any other remedy they may have, to an injunction restraining the violating Party from further violation of this Agreement in which case the prevailing Party shall be liable for all costs and expenses incurred, including but not limited to reasonable attorney's fees.

G. The limitations of liability for cargo loss and damage as well as other liabilities, arising out of the transportation of shipments, which originate outside the United States of America, may be subject to the laws of the country of origination.

H.    MODIFICATION OF AGREEMENT: This Agreement and Exhibit A et. seq. attached may not be amended, except by mutual written agreement, or the procedures set forth above (Pars 2.B and 2.C).

i.    Should CARRIER modify any provision of this agreement, whether in handwritten form, modified text or otherwise, such amendment shall not be effective, unless BROKER has initialed such change in close proximity thereto evidencing BROKER's specific acceptance of such modification.

ii.    Additionally, the provisions of this Agreement shall be deemed to supersede and shall prevail over any conflicting terms set forth in any load confirmation, rate confirmation, dispatch sheet or other document pertaining to this Agreement, whether any such document was signed prior to, contemporaneously with or subsequent to execution of this Agreement.

I.    NOTICES:
(i)    All notices provided or required by this Agreement, shall be made in writing and delivered, return receipt requested, to the addresses shown herein with postage prepaid; or by confirmed (electronically acknowledged on paper) fax, or by email with electronic receipt.

(ii)    The Parties shall promptly notify each other of any claim that is asserted against either of them by anyone arising out of the Parties performance of this Agreement.

(iii)    Notices sent as required hereunder, to the addresses shown in this Agreement shall be deemed sent to the correct address, unless the Parties are notified in writing of any changes in address.

J.    CONTRACT TERM: The term of this Agreement shall be one year from the date hereof and thereafter it shall automatically be renewed for successive one (1) year periods, unless terminated, upon thirty (30) day's prior written notice, with or without cause, by either Party at any time, including the initial term. In the event of termination of this Agreement for any reason, the Parties shall be obligated to complete performance of any work in progress in accordance with the terms of this Agreement.

K.    SEVERANCE: SURVIVAL: In the event any of the terms of this Agreement are determined to be invalid or unenforceable, no other terms shall be affected and the unaffected terms shall remain valid and enforceable as written. The representations, rights and obligations of the parties hereunder shall survive termination of this Agreement for any reason.

L.    COUNTERPARTS: This Agreement may be executed in any number of counterparts each of which shall be deemed to be a duplicate original hereof.

M.    FAX CONSENT: The Parties to this Agreement are authorized to fax to each other at the numbers shown herein, (or otherwise modified in writing from time to time) shipment availabilities, equipment and rate promotions, or any advertisements of new services.

N.    FORCE MAJEURE.    In the event that either Party is prevented from performing its obligations under this Agreement because of an occurrence beyond its control and arising without its fault or negligence, including without limitation, war, riots, rebellion, acts of God, acts of lawful authorities, fire, strikes, lockouts or other labor disputes, such failures to perform (except for any payments due hereunder) shall be excused for the duration of such occurrence. Economic hardships, including, but not limited to, recession and depression, shall not constitute Force Majeure events.

O.    ENTIRE AGREEMENT:    Unless otherwise agreed in writing, this Agreement contains the entire understanding of the Parties and supersedes all verbal or written prior agreements, arrangements, and understandings of the Parties relating to the subject matter stated herein, whether any such document was signed prior to, contemporaneously with or subsequent to execution of this Agreement. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms, and that no extrinsic evidence may be introduced to reform this Agreement in any judicial or arbitration proceeding involving this Agreement.

**IN WITNESS WHEREOF, the Parties agree to be bound by the electronically exchanged signatures of their duly authorized representatives contained in the Signed BROKER - CARRIER AGREEMENT, and by doing so, represent and warrant that they accept and agree to the terms contained in this BROKER - CARRIER AGREEMENT and have been or are specifically authorized to execute the BROKER - CARRIER AGREEMENT on behalf of the organization they represent.**

**EXHIBIT B**

**eduard@ridewayexpress.com**

| | |
|---|---|
| **From:** | dispatch@ridewayexpress.com on behalf of no-reply@carrier411.com |
| **Sent:** | Wednesday, March 26, 2025 1:45 PM |
| **To:** | dot@ridewayexpress.com |
| **Cc:** | doug@hawkeyetsi.com |
| **Subject:** | MC1652028 FreightGuard Report |

## MC1652028 FREIGHTGUARD REPORT

HAWKEYE TRANSPORTATION SERVICES, INC. reported its experience with your company and may make its report available to other transportation intermediaries, depending on your response. If you do not act within 72 hours, the report will indicate your failure to respond and will be released automatically.

### REPORTED COMPANY:
RIDEWAY EXPRESS INC
DBA RIDEWAY
SOUTHAMPTON, PA 18966
MC1652028

### THE FOLLOWING ITEMS WERE REPORTED:

- UNAUTHORIZED RE-BROKERING OF SHIPMENT
- FRAUDULENT ACTIVITY
- UNETHICAL OR DECEPTIVE BUSINESS PRACTICES

### ADDITIONAL COMMENTS:
BOOKED A LOAD WITH RIDEWAY 1/29. DRIVER CALLED ME TODAY SAYING THAT HE WAS SHORT PAYED ABOUT $1100 ON THIS LOAD FROM RIDEWAY. COME TO FIND OUT THAT THE CARRIER HAD HIS OWN MC WHEN HE HAULED THE LOAD AND RIDEWAY DOUBLE BROKED THE LOAD TO HIM.

### YOU HAVE 72 HOURS FROM MARCH 26, 2025 1:44 PM EST TO RESPOND

### VISIT CARRIERRESPONSE.COM TO RESPOND

### ENTER THIS RESPONSE CODE: 5076273051

### REPORT SUBMITTED BY:
MIGUEL MUNOZ
HAWKEYE TRANSPORTATION SERVICES, INC.
919 2ND AVE SW
SPENCER, IA 51301
PHONE: (712) 580-6649
PHONE: (888) 680-6649
FAX: (712) 580-5649

1

**eduard@ridewayexpress.com**

| | |
|---|---|
| **From:** | dispatch@ridewayexpress.com on behalf of MyCarrierPackets.com <carriersonline@assureassist.com> |
| **Sent:** | Wednesday, March 26, 2025 1:45 PM |
| **To:** | shelly@ridewayexpress.com; dot@ridewayexpress.com; juan@ridewayexpress.com |
| **Subject:** | Request for Response to Incident Report on MyCarrierPortal |

To Whom It May Concern at RIDEWAY EXPRESS INC,

We are writing to inform you that a report has been posted about your company on MyCarrierPortal. The report, which was posted by Hawkeye Transportation Services, Inc. on 03/26/2025, claims:

**Incident Date:** 26/03/2025
**Incident(s):**
Fraudulent Activity - Other
Subcontracted Freight without Broker or Freight Forwarder Authority
Unauthorized Re-brokering of Shipment (Double Brokering)
**Comments:**
Booked a load with rideway 1/29. driver called me today saying that he was short payed about $1100 on this load from rideway. Come to find out that the carrier had his own mc when he hauled the load and rideway double broked the load to him.

As you can imagine, this report has the potential to damage your reputation and affect your business. We would appreciate you responding to the report, addressing the concerns raised and supplying any relevant information or context. This would give you an opportunity to present your side of the story and help mitigate any negative impact on your business.

You can ignore this message or respond as an authorized contact for the entity named above.

Please respond by going **here**.

We value our relationship with you and hope by having your side of the story, we can work to keep your reputation intact. Please let us know if you have any questions or concerns.

Sincerely,

MyCarrierPortal Reputation Team

MyCarrierPortal
543 Country Club Dr Unit B338
Simi Valley, CA 93065-0637
P (818) 453-8591 F 818-401-0585

To unsubscribe to this email listing, please click here

**EXHIBIT C**

# Shipment Bill of Lading Report

1/29/2025 2:34:14 PM



1 of 1

**Shipment:** 195394                                    **Date:** 1/29/2025
**Pro Number:**                                         **Carrier Contact:**
**Carrier:** HawkEye                                    **Carrier Number:** HawkEye
**Vehicle Number:**
**Route:**

| Consignor | Consignee |
|---|---|
| LPI Warehouse #1<br>506 Twin Oaks Drive<br>Johnson City TN 37601<br>USA | Red - Fort Myers<br>13351 Rickenbacker Pkwy<br>Rep: Jesus 941-600-8747<br>Receiving hrs. M-F 10-6 / Sat. 10-3<br>Fort Myers FL 33913 |
| **Invoicee**<br>RecDirect Factory Outlets<br>506 Twin Oaks Dr.<br>Johnson City TN 37601<br>USA | **Third Party Freight Charges Invoicee** |
| **Special Instructions**<br>MUST CALL 24 HOURS BEFORE DELIVERY | Freight Charge Terms: (Freight charges are prepaid unless marked otherwise)<br><br>Prepaid:          Collect          Third Party |

| H.M. | Package | Pkg Type | Package Description | NMFC | Weight(LB) | Rate |
|---|---|---|---|---|---|---|
|  | 1 |  | Tops & covers |  | 4,000.00 |  |

|  |  |  |  |
|---|---|---|---|
| **# Packages:** | 1 | **COD Amt:** | 0.00 |
| **Total Weight:** | 4,000.00 LB | **Fee Terms:  Collect:** | **Prepaid:** |
| **Declared Value:** | 0.00 USD | **Customer Check Acceptable:** | |

**Carrier:** HawkEye                    **Carrier:**       Ridcway Ex
**Contact:**                            **Signature:** _____ Gray
**Date:** 1/29/2025                     **Date:** 01 / 29 / 25

If this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges

(Signature of Consignor)

01 / 30 / 25

(Signature Date)

**EXHIBIT D**

**eduard@ridewayexpress.com**

| | |
|---|---|
| **From:** | eduard@ridewayexpress.com |
| **Sent:** | Wednesday, March 26, 2025 2:57 PM |
| **To:** | mike@hawkeyetsi.com |
| **Cc:** | safety@ridewayexpress.com |
| **Subject:** | MC1652028 FREIGHTGUARD REPORT |
| **Attachments:** | 20250121_153430_Application.pdf; 20250121_153508_lease agreement.pdf; 20250121_153454_Clearing house.pdf; 20250121_153501_Insurance response.pdf; 20250121_153523_MVR.pdf; 20250122_163008_Drug test.pdf; 20250123_115635_psp.pdf; 20250123_124121_hireright.pdf; 20250123_145141_Result_Report (6).pdf; Fwd: Welcome to RIDEWAY Express (23.6 KB); 328 Temp.pdf; 260255942035 (1).jpg; 260255941035.jpg; Paystub-Ryan Crosby-Fri_31_Jan_2025_120000AM_638749114994657058.pdf |
| | |
| **Importance:** | High |

Mike,

Attached are documents pertaining to PRO# 54697. This load was picked up on January 29, 2025, and was assigned to driver Ryan Crosby. As we work exclusively with owner-operators who lease onto our company, we strictly comply with DOT regulations. The attached files confirm that, for this load, the driver and vehicle were under RIDEWAY's exclusive authority—not that of any other company.
Please note that if this were a double brokered load, we would not have performed a pre-employment drug test, clearinghouse check, or the other required onboarding steps mandated by the DOT. Our process differs from the broker model: we onboard drivers who do not have their own authority and lease them onto our authority. Although the driver claimed to have his own authority, he was never operating independently; the load was always managed exclusively by RIDEWAY, with both the driver and the unit leased to our company.
For your reference, I have attached the following documents:

1. **Driver Application** – executed on January 21, 2025.
2. **Equipment Lease Agreement** – executed on January 21, 2025. (Please see Paragraph 2, which states that the truck operates solely under RIDEWAY's authority.)
3. **Federal Drug & Alcohol Query** – completed on January 21, 2025.
4. **Insurance Quote** – confirming that the driver operates under our authority and is insured by us.
5. **Motor Vehicle Record (MVR)** – obtained during the onboarding process.
6. **Drug Test Receipt** – showing the drug test was taken under RIDEWAY's authority on January 22, 2025.
7. **PSP Report** – completed during the onboarding process.
8. **HireRight Report** – completed during the onboarding process.
9. **Drug Test Results** – received on January 23, 2025.
10. **Welcome Email** – sent by our Safety Department on January 27, 2025.
11. **Truck Registration** – evidencing that the truck was registered under RIDEWAY at the time of the load.
12. **Paper Log Records** – maintained per DOT regulations due to a reported ELD malfunction during the load.
13. **Driver Settlement** – documentation of the payment for this load.

I believe the driver's statement is inaccurate. I apologize for the number of documents, but I wanted to ensure you have full assurance that our company does not double broker loads. Please remove the unwarranted Freightgard from this matter.
Thank you for your assistance. I look forward to moving more loads with you.


Thanks,


**Eduard Shcherbakov**
**Phone:** +1-307-439-6451
**Web:** ridewayexpress.com



**EXHIBIT E**

**eduard@ridewayexpress.com**

| | |
|---|---|
| **From:** | Mike  Fitzgerald <Mike@hawkeyetsi.com> |
| **Sent:** | Wednesday, March 26, 2025 3:10 PM |
| **To:** | eduard@ridewayexpress.com |
| **Cc:** | safety@ridewayexpress.com |
| **Subject:** | Re: MC1652028 FREIGHTGUARD REPORT |

He is taking it down

MIKE

**From:** eduard@ridewayexpress.com <eduard@ridewayexpress.com>
**Sent:** Wednesday, March 26, 2025 1:56 PM
**To:** Mike Fitzgerald <Mike@hawkeyetsi.com>
**Cc:** safety@ridewayexpress.com <safety@ridewayexpress.com>
**Subject:** MC1652028 FREIGHTGUARD REPORT

Mike,

Attached are documents pertaining to PRO# 54697. This load was picked up on January 29, 2025, and was assigned to driver Ryan Crosby. As we work exclusively with owner-operators who lease onto our company, we strictly comply with DOT regulations. The attached files confirm that, for this load, the driver and vehicle were under RIDEWAY's exclusive authority—not that of any other company.

Please note that if this were a double brokered load, we would not have performed a pre-employment drug test, clearinghouse check, or the other required onboarding steps mandated by the DOT. Our process differs from the broker model: we onboard drivers who do not have their own authority and lease them onto our authority. Although the driver claimed to have his own authority, he was never operating independently; the load was always managed exclusively by RIDEWAY, with both the driver and the unit leased to our company.

For your reference, I have attached the following documents:

1. **Driver Application** – executed on January 21, 2025.
2. **Equipment Lease Agreement** – executed on January 21, 2025. (Please see Paragraph 2, which states that the truck operates solely under RIDEWAY's authority.)
3. **Federal Drug & Alcohol Query** – completed on January 21, 2025.
4. **Insurance Quote** – confirming that the driver operates under our authority and is insured by us.
5. **Motor Vehicle Record (MVR)** – obtained during the onboarding process.
6. **Drug Test Receipt** – showing the drug test was taken under RIDEWAY's authority on January 22, 2025.
7. **PSP Report** – completed during the onboarding process.
8. **HireRight Report** – completed during the onboarding process.
9. **Drug Test Results** – received on January 23, 2025.
10. **Welcome Email** – sent by our Safety Department on January 27, 2025.
11. **Truck Registration** – evidencing that the truck was registered under RIDEWAY at the time of the load.
12. **Paper Log Records** – maintained per DOT regulations due to a reported ELD malfunction during the load.

13. **Driver Settlement** – documentation of the payment for this load.

I believe the driver's statement is inaccurate. I apologize for the number of documents, but I wanted to ensure you have full assurance that our company does not double broker loads. Please remove the unwarranted Freightgard from this matter.
Thank you for your assistance. I look forward to moving more loads with you.

Thanks,

**Eduard Shcherbakov**
**Phone:** +1-307-439-6451
**Web:** ridewayexpress.com



WARNING: This email originated outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**EXHIBIT F**

**eduard@ridewayexpress.com**

| | |
|---|---|
| **From:** | eduard@ridewayexpress.com |
| **Sent:** | Friday, April 4, 2025 4:15 PM |
| **To:** | 'Mike  Fitzgerald' |
| **Cc:** | safety@ridewayexpress.com |
| **Subject:** | RE: MC1652028 FREIGHTGUARD REPORT |

| | |
|---|---|
| **Importance:** | High |

Mike,

      The unfounded freightguard still shows on MyCarrierPortal. Please have it removed asap and confirm. As this is tarnishing our reputation and at this point costing us money.

Thanks,

**Eduard Shcherbakov**
**Phone:** +1-307-439-6451
**Web:** ridewayexpress.com



**From:** Mike Fitzgerald <Mike@hawkeyetsi.com>
**Sent:** Wednesday, March 26, 2025 3:10 PM
**To:** eduard@ridewayexpress.com
**Cc:** safety@ridewayexpress.com
**Subject:** Re: MC1652028 FREIGHTGUARD REPORT

He is taking it down

MIKE

**From:** eduard@ridewayexpress.com <eduard@ridewayexpress.com>
**Sent:** Wednesday, March 26, 2025 1:56 PM
**To:** Mike Fitzgerald <Mike@hawkeyetsi.com>
**Cc:** safety@ridewayexpress.com <safety@ridewayexpress.com>
**Subject:** MC1652028 FREIGHTGUARD REPORT

Mike,

      Attached are documents pertaining to PRO# 54697. This load was picked up on January 29, 2025, and was assigned to driver Ryan Crosby. As we work exclusively with owner-operators who lease onto

1

our company, we strictly comply with DOT regulations. The attached files confirm that, for this load, the driver and vehicle were under RIDEWAY's exclusive authority—not that of any other company.

Please note that if this were a double brokered load, we would not have performed a pre-employment drug test, clearinghouse check, or the other required onboarding steps mandated by the DOT. Our process differs from the broker model: we onboard drivers who do not have their own authority and lease them onto our authority. Although the driver claimed to have his own authority, he was never operating independently; the load was always managed exclusively by RIDEWAY, with both the driver and the unit leased to our company.

For your reference, I have attached the following documents:

1. **Driver Application** – executed on January 21, 2025.
2. **Equipment Lease Agreement** – executed on January 21, 2025. (Please see Paragraph 2, which states that the truck operates solely under RIDEWAY's authority.)
3. **Federal Drug & Alcohol Query** – completed on January 21, 2025.
4. **Insurance Quote** – confirming that the driver operates under our authority and is insured by us.
5. **Motor Vehicle Record (MVR)** – obtained during the onboarding process.
6. **Drug Test Receipt** – showing the drug test was taken under RIDEWAY's authority on January 22, 2025.
7. **PSP Report** – completed during the onboarding process.
8. **HireRight Report** – completed during the onboarding process.
9. **Drug Test Results** – received on January 23, 2025.
10. **Welcome Email** – sent by our Safety Department on January 27, 2025.
11. **Truck Registration** – evidencing that the truck was registered under RIDEWAY at the time of the load.
12. **Paper Log Records** – maintained per DOT regulations due to a reported ELD malfunction during the load.
13. **Driver Settlement** – documentation of the payment for this load.

I believe the driver's statement is inaccurate. I apologize for the number of documents, but I wanted to ensure you have full assurance that our company does not double broker loads. Please remove the unwarranted Freightgard from this matter.

Thank you for your assistance. I look forward to moving more loads with you.

Thanks,

**Eduard Shcherbakov**
**Phone:** +1-307-439-6451
**Web:** ridewayexpress.com



WARNING: This email originated outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.