**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RIDEWAY EXPRESS, INC.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.   25-2027** |
| | : | |
| **HAWKEYE TRANSPORTATION** | : | |
| **SERVICES, INC., HAWKEYE** | : | |
| **TRANSPORT, LLC** | : | |

**MEMORANDUM**

**MURPHY, J.**                                                              **October 9, 2025**

You agree to perform a service for a company.  The governing contract provides that a dispute arising out of the contract must be arbitrated.  You perform the service, and your relationship with the company concludes.  Two months later, the company complains about your performance on a forum visible to, and closely watched by, everyone in your industry.  The complaint all but accuses you of breaching the contract and your reputation suffers materially.  You decide to respond by suing for defamation and anything else your lawyer can think of.  Do you have to take your claims to arbitration even though the challenged conduct came after the conclusion of the contract?  For the contract and conduct at issue here, our answer is yes.

In this case, Rideway Express, Inc., a motor carrier, entered into an agreement with Hawkeye Transportation Services, Inc. (HTS), a freight broker company, to deliver a shipment.  The agreement said that a dispute arising out of the agreement must be arbitrated.  It also expressly prohibited Rideway from re-brokering or co-brokering the shipment to another motor carrier — a deprecated practice.  After Rideway delivered the shipment, HTS submitted a report on a portal visible to key industry stakeholders, accusing Rideway of double brokering.  Rideway lost business and credibility.  Rideway responded by coming here and suing HTS and Hawkeye Transport, LLC — an interstate motor carrier that shares a website with HTS and that, according

to Rideway, operates jointly with HTS — for defamation *per se*, commercial disparagement, tortious interference, and false advertising.

HTS seeks to enforce the arbitration provision, which it asserts governs this dispute, as well as an Iowa venue provision in the same agreement.  Transport, for its part, seeks dismissal for lack of personal jurisdiction or failure to state a claim.  At oral argument, the parties clarified that no party seeks a stay and that enforcement of the arbitration provision should result in dismissal of the entire case.  We now grant HTS's motion to dismiss under Rule 12(b)(1) because Rideway's claims must be arbitrated.  All other bases for dismissal are denied.

I.      FACTUAL BACKGROUND

Rideway entered into a written Broker-Carrier Agreement (the Agreement) with HTS to deliver a shipment from Tenneessee to Florida on January 29, 2025.  DI 1, Exhibit A, C.  The Agreement contained this arbitration provision: "In the event of a dispute arising out of this Agreement, including but not limited to Federal or State statutory claims, the party's sole recourse (except provided below) shall be to arbitration."  DI 1, Exhibit A at 31.  The Agreement also included this forum provision: "(iii) (IF i AND/OR ii ARE ADOPTED, THEN iii MUST BE INCLUDED) Venue, controlling law, and jurisdiction in any legal proceedings under Subps. i or ii above shall be in the State of Iowa."  *Id.*

The shipment was delivered on January 29th.  However, nearly two months later, an individual submitted what is known as a FreightGuard report on two platforms — Carrier411 and MyCarrierPortal — that are used by brokers, shippers, and other stakeholders in the motor transport industry.  DI 20, Exhibit A.  A FreightGuard report is essentially a complaint about a party working in the motor transport industry.  The contact information for the report's author

listed "Hawkeye Transportation Services, Inc." as the company and "919 2nd Ave SW, Spencer, IA 51301" as the address. *Id.* The principal place of business for HTS is 16 2nd Ave SW, Aberdeen, SD 57401, whereas 919 2nd Ave SW, Spencer, IA 51301 is the principal place of business for Transport — an interstate motor carrier that Rideway asserts operates jointly with HTS. DI 20 at 2-3 ("HTS and Transport "jointly operate both as a motor carrier and as a freight broker business ('Hawkeye Transportation'), sometimes transporting goods for third parties as a motor carrier, and other times arranging for the transportation of goods by third party motor carriers such as Rideway. Defendants promote themselves as a singular business operation with both freight brokering/logistics and drivers."). The report stated, "BOOKED A LOAD WITH RIDEWAY 1/29. DRIVER CALLED ME TODAY SAYING THAT HE WAS SHORT PAYED ABOUT $1100 ON THIS LOAD FROM RIDEWAY. COME TO FIND OUT THAT THE CARRIER HAD HIS OWN MC WHEN HE HAULED THE LOAD AND RIDEWAY DOUBLE BROKED THE LOAD TO HIM." DI 20, Exhibit A.

The Agreement specifically stated that Rideway would not "re-broker, co-broker, subcontract, assign, interline, or transfer the transportation of shipments hereunder to any other persons or entity conducting business under a different operating authority, without prior written consent of" HTS. DI 1, Exhibit A at 27. As explained by the parties during oral argument, re-brokering or co-brokering occurs when the carrier transfers its obligations to carry a shipment to another carrier and is a strongly disfavored practice in the transportation industry. When a FreightGuard report is submitted, the company about which the complaint is made receives a notification and 72 hours to respond to the report. DI 20, Exhibit A. Approximately one hour after receiving this notification, Rideway emailed HTS, asserting Rideway did not double broker

3

the shipment, providing various documentation in support of this assertion, and asking HTS to

remove the report.  *Id.*, Exhibit C.  Minutes later, HTS responded and stated the complainant was

taking the report down.  *Id.*, Exhibit D.  The report was still posted nine days later, prompting

Rideway to follow up with HTS to request its removal.  *Id.*, Exhibit E.  Approximately two

weeks after it was posted, the report was removed.  *Id.* at 7.

As a result of this report, Rideway initially brought a complaint against HTS and

Hawkeye Transportation, LLC — which Rideway averred "jointly operate" and "promote

themselves as a singular business operation" — for (1) defamation *per se*; (2) commercial

disparagement; (3) tortious interference with business relations; (4) breach of contract; and (5)

false advertising under the Lanham Act, 15 U.S.C. § 1125(a).  DI 1 at 3, 10-22.  As an exhibit,

Rideway attached the Agreement.  *Id.*, Exhibit A.  HTS filed a motion to dismiss pursuant to

Fed. R. Civ. P. 12(b)(1) and (6) based on the Agreement's arbitration and venue provisions (DI

8), which Rideway opposed (DI 9).  After it became apparent that Rideway intended to sue

Hawkeye Transport, LLC instead of Hawkeye Transportation, LLC, Rideway amended its

complaint (DI 20), and we dismissed HTS's motion to dismiss as moot (DI 19).

Importantly, in Rideway's amended complaint, Rideway removed the breach of contract

claim, maintaining only the tort and the Lanham Act claims.  DI 20.  Rideway also did not attach

the Agreement to its amended filing.  According to Rideway, the FreightGuard report caused it

to lose past and prospective business opportunities, suffer damages to its reputation and industry

relationships, and experience a decline in carrier rankings and credibility among brokers.  *Id.* at

7.  It claims "multiple brokers refused to offer freight opportunities based expressly on the false

FreightGuard report" and asserts there were no outstanding FreightGuard reports on Rideway

other than the report at issue.  *Id.* at ¶ 15 (cleaned up).

HTS and Transport filed separate motions to dismiss under Fed. R. Civ. P. 12(b), both of
which Rideway opposes.

## II.    MOTIONS AT ISSUE

### A.    HTS's motion to dismiss

HTS filed a motion to dismiss under Fed. R. Civ. P. 12(b)(1), asserting we lack subject
matter jurisdiction due to the arbitration provision.  DI 25.  It avers that the allegedly defamatory
communications HTS made about Rideway resulted from a shipment that was booked and
arranged pursuant to the Agreement.  DI 25-1 at 7.  Thus, HTS asserts, Rideway's claims arise
under the Agreement.  HTS maintains that the operative question is whether Rideway provided
the transportation services itself or engaged an unauthorized third party to do so — an issue
which derives directly from Rideway's obligations under the Agreement and its alleged failure to
meet them.  *Id.*  Additionally, HTS argues the FreightGuard report at issue raises the question of
what "double-brokered" means and why that would be problematic — the answers to which lie
in the Agreement.  DI 28 at 6.  Finally, HTS implies Rideway amended its pleadings to avoid
dismissal, in a manner that is contrary to its original complaint — highlighting Rideway's
decision not to include the Agreement in its amended complaint.  DI 25 at 1-2.

Rideway acknowledges the arbitration provision in the Agreement, but insists that its tort
and Lanham Act claims fall outside the scope of this provision.  Rideway maintains that these
allegedly defamatory statements were separate and distinct from the parties' contractual
relationship because they were extraneous to the relationship and published after Rideway
completed its obligations under the contract.  DI 27 at 5-8.  According to Rideway, the

adjudication of the defamation and commercial disparagement claims will focus on the falsity of the statements and damages to Rideway, neither of which turn on contract interpretation, performance, or formation. *Id.* at 6. Moreover, Rideway notes that the only relevant contracts to its tortious interference claim are existing or prospective contracts between Rideway and third parties — rendering the Agreement irrelevant to this claim. *Id.* at 7. Similarly, Rideway proffers that the Agreement is immaterial to its false advertising claim under the Lanham Act because such a claim relates to the effect of false statements on third-party purchasing decisions. *Id.* at 8. Rideway further asserts that its amended complaint does not contradict any factual statements made in its original complaint, suggesting that it simply dropped the breach of contract claim to focus its claims on defendants' false statements. *Id.* at 3-4.

HTS also seeks dismissal under Fed. R. Civ. P. 12(b)(3), arguing this is an improper forum due to the venue provision in the Agreement. DI 25. It asserts that, taken together, the arbitration provision and venue provision establish that the parties agreed that (1) the State of Iowa would be the only forum for resolving any disputes arising out of the Agreement; and (2) Iowa law controlled such disputes. DI 25-1 at 7-8. Because it avers that the arbitration provision governs this dispute, HTS reasons that there is no appropriate federal venue to which to transfer this matter, such that no analysis under 49 U.S.C. § 1404(a) is necessary. *See id.* at 8.

In response, Rideway maintains that the venue provision does not apply because the arbitration and venue provisions go together. DI 27 at 8. Because the dispute here is not governed by the arbitration provision, Rideway argues the venue provision is likewise inapplicable. *Id.* Rideway also criticizes HTS for not analyzing the convenience factors under 28 U.S.C. § 1404. *Id.*

B.     **Transport's motion to dismiss**

Transport also filed a motion to dismiss under Fed. R. Civ. P. 12(b)(2) and (6), arguing

that Rideway failed to state a claim upon which relief may be granted or to establish personal

jurisdiction over Transport.  DI 26.  According to Transport, HTS acted as the property broker,

arranged for Rideway to transport the shipment, and submitted the FreightGuard report.  DI 26-1

at 5-6.  Nowhere, Transport insists, does Rideway assert any independent claim against

Transport with respect to this shipment or alleged defamation.  *Id.* at 6-7.  Nor, Transport

protests, does Rideway aver any business relationship between it and Transport to support a

Lanham Act claim against Transport.  *Id.* at 8.  Transport further argues that a FreightGuard

report is not an advertisement for purposes of the Lanham Act.  *Id.*  It maintains that Rideway's

assertions that HTS and Transport jointly operate as a single entity, and its focus on the

companies' shared website and address, do not establish that the two businesses are one entity

subject to enterprise liability.  DI 30 at 1, 2-4.  Because HTS and Transport are distinct legal

entities, performing separate roles within the transportation industry, Transport contends the

business between Rideway and HTS does not establish personal jurisdiction over Transport.  DI

26-1 at 9.  Transport argues that Rideway has not demonstrated any business contact or

relationship between Transport and Rideway, nor any allegation that Transport transacted

business within Pennsylvania or otherwise purposefully availed itself of Pennsylvania law.  *Id.* at

9-10.  In its view, jurisdictional discovery would be inappropriate because Rideway's claim

against Transport is patently frivolous.  DI 30 at 7.

Rideway rejects Transport's characterization, arguing it alleges that both HTS and

Transport were involved in the defamatory FreightGuard report.  DI 29 at 2.  It insists the

amended complaint pleads concrete, specific facts establishing enterprise liability, based on the

defendants' own public materials.  *Id.* at 3.  Rideway asserts it has shown a unity of interests

between the corporations and specifically notes the corporations' shared website and address.  *Id.*

Moreover, Rideway avers that allowing Transport to benefit from integrated branding, yet

disclaim responsibility for a tort committed from its office, would promote injustice and cause

the exact abuse that the enterprise liability doctrine seeks to prevent — especially if Transport

holds the assets of the business.  *Id.*  As such, Rideway argues personal jurisdiction has been

established.  *Id.* at 4.  In the alternative, Rideway contends jurisdiction would be proper under an

*alter ego* theory or the *Calder* effects test.  *Id.*; *see also Calder v. Jones*, 465 U.S. 783 (1984).  If

we believe the present record is insufficient, Rideway asks this court to permit limited

jurisdictional discovery.  *Id.* at 5.

### III.    STANDARD OF REVIEW

#### A.    Rule 12(b) challenges

Rule 12(b)(1) permits a party to move to dismiss a case based on a lack of subject matter

jurisdiction.  Fed. R. Civ. P. 12(b)(1).  This challenge may be either a facial or factual attack.

*Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).  Facial challenges attack subject matter

jurisdiction under the assumption that the allegations in the complaint are true.  *See id.* (citation

omitted).  In contrast, factual challenges attack the factual allegations underlying the complaint's

assertion respecting jurisdiction.  *See id.* (citation omitted).  Though HTS does not say so

explicitly, it appears to raise a facial challenge under Rule 12(b)(1), as it contests this court's

jurisdiction to adjudicate Rideway's tort and Lanham Act claims due to the arbitration provision.

If we lack subject matter jurisdiction, we must dismiss this action.  Fed. R. Civ. P. 12(h)(3); *see*

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

A party may also move to dismiss a case based on improper venue. Fed. R. Civ. P. 12(b)(3). When deciding a motion to dismiss on this ground, we must "accept as true all of the allegations in the complaint, unless those allegations are contradicted by the defendants' affidavits." *Bockman v. First Am. Mktg. Corp.*, 459 Fed. Appx. 157, 158 n.1 (3d Cir. 2012) (citation omitted); *Leone v. Cataldo*, 574 F. Supp. 2d 471, 483 (E.D. Pa. 2008) (citations omitted). If we examine facts beyond the complaint to ascertain venue, we must make all reasonable inferences and resolve all factual disputes in the plaintiff's favor. *PrimePay, LLC v. Prime Trust, LLC*, 559 F. Supp. 3d 394, 397 (E.D. Pa. 2021) (citation and footnote omitted). The movant carries the burden of proving the venue is improper. *Myers v. American Dental Asso.*, 695 F.2d 716, 724, 19 V.I. 642 (3d Cir. 1982) (citations and footnote omitted).

Personal jurisdiction, which a party can challenge under Rule 12(b)(2), is another basis for dismissal. Fed. R. Civ. P. 12(b)(2). The defendant must "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (citations and internal quotations omitted). A corporation's presence within a state "can be manifested only by activities carried on in its behalf by those who are authorized to act for it." *Id.* In the context of intentional tort claims, courts have applied what is called the *Calder* "effects" test to determine whether it may exercise personal jurisdiction over an alleged tortfeasor — who otherwise lack minimum contacts under the *Int'l Shoe* test — which "requires a plaintiff to plead facts establishing that: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of

9

the harm in the forum; and (3) the defendant expressly aimed his tortious conduct at the forum."

*Hasson v. FullStory, Inc.*, 114 F.4th 181, 187 (3d Cir. 2024) (citation omitted); *see also Calder*,

465 U.S. at 791.

Finally, a party may move to dismiss by asserting the complaint failed to state a claim

upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  When reviewing a Rule 12(b)(6)

motion, we must "accept as true all allegations in the complaint and all reasonable inferences that

can be drawn from them after construing them in the light most favorable to the nonmovant."

*Davis*, 824 F.3d at 341 (citation omitted).  Further, we must only consider "the complaint,

exhibits attached to the complaint, matters of public record, as well as undisputedly authentic

documents if the complainant's claims are based upon these documents."  *Id.* (citation omitted).

## B.      Tort and Lanham Act claims

In a defamation action, the plaintiff must prove: "1) the defamatory character of the

communication; 2) its publication by the defendant; 3) its application to the plaintiff; 4) an

understanding by the reader or listener of its defamatory meaning; and 5) an understanding by

the reader or listener of an intent by the defendant that the statement refer to the plaintiff."

*United States Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 923 (3d Cir. 1990)

(citation omitted).  One type of defamation — defamation *per se* — "occurs where a publication

imputes to another conduct, characteristics, or a condition that would adversely affect her in her

lawful business or trade[.]"  *Franklin Prescriptions, Inc. v. New York Times Co.*, 424 F.3d 336,

343 (3d Cir. 2005) (citations and internal quotations omitted).  To prevail, a plaintiff must prove

the defamation affected its reputation or caused it humiliation.  *Id.* (citation omitted).

Pennsylvania law dictates that a publication which, on its face, is directed against a corporate

vendor's or manufacturer's goods or products will not be libelous *per se* as to the corporation

"unless by fair construction and without the aid of extrinsic evidence it imputes to the

corporation fraud, deceit, dishonesty, or reprehensible conduct in its business in relation to said

goods or product." *United States Healthcare*, 898 F.2d at 924 (citation omitted). A party may

defend against a defamation claim by proving the statement it made was true. *Id.* at 923

(citations omitted).

In contrast to a defamatory statement, a commercially disparaging statement "is one

which is intended by its publisher to be understood or which is reasonably understood to cast

doubt upon the existence or extent of another's property in land, chattels or intangible things, or

upon their quality . . . if the matter is so understood by its recipient." *United States Healthcare*,

898 F.2d at 924 (citations and internal quotations omitted). To succeed on a disparagement

claim, the plaintiff must establish: "1) that the disparaging statement of fact is untrue or that the

disparaging statement of opinion is incorrect; 2) that no privilege attaches to the statement; and

3) that the plaintiff suffered a direct pecuniary loss as the result of the disparagement." *Id.*

(citation omitted).

Tortious interference occurs when one "intentionally and improperly interferes with the

performance of a contract . . . between another and a third person by inducing or otherwise

causing the third person not to perform the contract." *Id.* at 925 (citations omitted). To prevail,

the plaintiff must demonstrate: "(1) a prospective contractual relation; (2) the purpose or intent to

harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or

justification on the part of the defendant; and (4) the occasioning of actual damage resulting from

the defendant's conduct." *Id.* (citations omitted).

Beyond these common law torts, relief may also be available to a plaintiff under the

Lanham Act, 15 U.S.C. § 1125(a) — a federal statute which provides a cause of action for any

false, including misleading, product descriptions or representations. *Id.* at 921 (citations

omitted). This includes statements made by a defendant about another person's products. *Id.* at

921-922 (citation omitted). To raise a successful Lanham Act claim, the plaintiff must establish:

1) the defendant made false or misleading statements regarding his own or another's product; 2)

such statements involved actual deception or, at a minimum, a tendency to deceive a substantial

percentage of the intended audience; 3) this deception is likely to impact purchasing decisions

and is thus material; 4) the advertised goods moved in interstate commerce; and 5) there is a

likelihood of injury to the plaintiff with respect to declining sales, a loss of good will, or related

consequences. *Id.* at 922-923 (citation omitted).

### C.     Arbitration

There is a presumption of arbitrability when a contract contains an arbitration clause,

such that an order to arbitrate a specific grievance should be granted "unless it may be said with

positive assurance that the arbitration clause is not susceptible of an interpretation that covers the

asserted dispute." *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986)

(citations and internal quotations omitted). Doubts regarding whether the arbitration clause

covers the dispute should be resolved in favor of arbitration. *Id.* (citations omitted). Indeed, the

Federal Arbitration Act (FAA) reflects a "strong federal policy in favor of the resolution of

disputes through arbitration." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160

(3d Cir. 2009) (citation omitted). But before compelling arbitration pursuant to the FAA, we

must determine "(1) a valid agreement to arbitrate exists, and (2) the particular dispute falls

within the scope of that agreement." *Id.* (citations omitted).  We apply Pennsylvania principles

of contract law to assess whether the parties agreed to arbitrate, which requires us to examine:

"(1) whether both parties manifested an intention to be bound by the agreement; (2) whether the

terms of the agreement are sufficiently definite to be enforced; and (3) whether there was

consideration." *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 533 (3d

Cir. 2009) (citations omitted).

When arbitration provisions contain phrases such as "arising out of" or "arising under,"

we typically construe those provisions broadly.  *Battaglia v. McKendry*, 233 F.3d 720, 727 (3d

Cir. 2000) (citation omitted).  And because arbitration clauses are closely related to jurisdiction

provisions, we may draw upon the "arising under" language contained in Article III, section 2 of

the United States Constitution in construing an arbitration clause containing this phrase.

*Medtronic AVE Inc. v. Cordis Corp.*, 100 Fed. Appx. 865, 868 (3d Cir. 2004).  Just as a case

"arises" under the Constitution or laws of the United States when its correct resolution depends

upon the construction of the Constitution or laws of the United States, so, too, would a dispute

"arise from" an agreement when its correct resolution depends upon the construction of that

agreement.  *Id.* (citation omitted).

Additionally, an arbitration clause stating arbitration applied to "any controversy arising

hereunder" is considered sufficiently expansive to "cover not only disputes arising during the life

of an agreement, but also those which arise from its demise." *Goodwin v. Elkins & Co.*, 730

F.2d 99, 109-10 (3d Cir. 1984); *see also id.* at 110 ("When parties create a contractual

relationship which includes a broad arbitration agreement, they intend to include within the

scope of arbitration any dispute arising from the termination of that contractual relationship

13

unless they clearly evidence a purpose to exclude such disputes.") (*citing Waddell v. Shriber*, 348 A.2d 96, 101 (Pa. 1975)).  Thus, claims such as those for defamation that occur after the contractual relationship ends may be within the scope of the termination of that relationship, such that they are covered by the arbitration provision.  *See, e.g.*, *Goodwin*, 730 F.2d at 110; *Wood v. Prudential Ins. Co. of Am.*, 207 F.3d 674, 681 (3d Cir. 2000); *Richards v. Am. Acad. Health Sys., LLC.*, 2020 WL 2615688, at *10 (E.D. Pa. May 22, 2020); *but see Nicholas v. Grapetree Shores, Inc.*, 392 F. App'x 7, 9 (3d Cir. 2010) (affirming that defamation claims concerning statements made about the reasons a former employee was no longer employed, several years after the employment concluded, did not involve employee-employer dealings because the statements were made in the context of a different relationship between the parties).

## IV.    DISCUSSION

### A.    Rideway's claims fall within the scope of the valid arbitration provision

The parties do not dispute that the first factor required to compel arbitration is met here: that there was a valid agreement to arbitrate.  *Kirleis*, 560 F.3d at 160 (citations omitted).  Based on the record before us, there is no indication that the arbitration provision was invalid, such as any claim or suggestion of coercion.  Nor has anyone suggested that the Agreement contains indefinite terms or was unsigned by either party.  Moreover, the parties performed the shipment of the goods governed by the Agreement.  Taken together, the record supports a finding that there was a valid agreement to arbitrate between Rideway and HTS.

The bigger question is whether Rideway's tort and Lanham Act claims "aris[e] out of" the Agreement, such that they fall within the scope of the arbitration provision.  DI 1, Exhibit A at 31.  Here, the arbitration provision covered "a dispute arising out of this Agreement."  *Id.*  Our

courts consider such language expansive and inclusive of a broad range of disputes — even those that arise from the agreement's "demise." *Goodwin*, 730 F.2d at 109-10; *see also Wood*, 207 F.3d at 681; *Richards*, 2020 WL 2615688, at \*10.  Under Pennsylvania law, "[w]hen parties create a contractual relationship which includes a broad arbitration agreement, they intend to include within the scope of arbitration any dispute arising from the termination of that contractual relationship unless they clearly evidence a purpose to exclude such disputes." *Goodwin*, 730 F.2d at 110 (*citing Waddell*, 348 A.2d at 101).  As nothing in the Agreement indicates the parties intended to exclude from the scope of arbitration disputes arising after the termination of the Agreement, we conclude the arbitration provision applies to such disputes.

It is also clear that Rideway's claims regarding the FreightGuard report arise out of the Agreement.  The Agreement prohibits the "re-broker[ing]" or "co-broker[ing]" of the transportation of shipments and provides for remedies in the event of a breach.  DI 1, Exhibit A at 27.  The FreightGuard report accuses HTS of double brokering the load shipped on January 29th.  Defendants' allegedly tortious conduct and false advertising thus center on Rideway's contractual obligations under the Agreement and whether it fulfilled them.  To prove its claims, Rideway must prove HTS's statement regarding double brokering was untrue, or at least guard against a defense that the statement was true.  Such an exercise requires interpretation and application of the Agreement.

The Third Circuit has held that allegedly defamatory statements made after the termination of an agreement fall under the arbitration provision contained within that

agreement.[1]  In *Wood*, a former employee sued his former employer for, *inter alia*, defamation, due to the employer mailing his termination letter to an insurance company after his termination. *Wood*, 207 F.3d at 681.  The National Association of Securities Dealers (NASD) Uniform Application for Securities Industry Registration called for arbitration of any dispute, claim, or controversy between Wood and the employer to be arbitrated and required arbitration for any claim "arising out of the employment or termination of employment of such associated person(s) with such member[.]"  *Id.* (citation omitted).  Just as here, the defamation was arguably separate from and after the contractual business had concluded.  Yet the Third Circuit concluded that because the defamation constituted a description of the former employee's activities while employed by the employer and was contained in the termination letter, the defamation claim arose out of his employment and termination, such that the claim was arbitrable.  *Id.*

This case is analogous.  The defendants' allegedly tortious conduct and false advertising concerned Rideway's performance of the contract between HTS and Rideway.  Like *Wood*, the defamation also occurred after the contract's completion.  Accordingly, because Rideway's claims are necessarily tied to its performance of the Agreement, and given the strong federal policy in favor of arbitration and requirement to resolve all doubts in favor of arbitration, we conclude this broad arbitration provision governs Rideway's claims and grant HTS's motion to dismiss on this basis.[2]

---

[1] *See also Goodwin*, 730 F.2d at 110 (citation omitted); *Richards*, 2020 WL 2615688, at *10; *Tecnimont S.p.A. v. Holtec Int'l*, 2018 WL 3854797, *5 (D.N.J. Aug. 13, 2018).

[2] No party asked us to maintain jurisdiction and stay this case pending arbitration.

**B.      The venue provision does not clearly preclude this court as a forum**

The venue provision contained in the Agreement states, "(IF i AND/OR ii ARE ADOPTED, THEN iii MUST BE INCLUDED) Venue, controlling law, and jurisdiction in any legal proceedings under Subps. i or ii above shall be in the State of Iowa."  DI 1, Exhibit A at 31. Subsection iii is nested under section 4, subsection D of the Agreement.  *Id.*  Naturally, the reader hopes to find the referenced "i or ii above" in the agreement to see what legal proceedings the venue provision affects.  But the only (i) and (ii) in section 4 fall under subsection C, which is titled "WAIVER OF PROVISIONS."  *Id.* at 30-31.  These state:

> (i) Failure of either Party to enforce a breach or waiver of any provision or term of this Agreement shall not be deemed to constitute a waiver of any subsequent failure or breach, and shall not affect or limit the right of either Party to thereafter enforce such a term or provision.
>
> (ii) This Agreement is for specified services pursuant to 49 U.S.C. § 14101(b). To the extent that terms and conditions herein are inconsistent with Part (b), Subtitle IV, of Title 49 U.S.C. (ICC Termination Act of 1995), the Parties expressly waive any or all rights and remedies they may have under the Act.

*Id.* at 31.  It is by no means clear that subsections (i) and (ii), which discuss the waiver of a party's right to enforce a term or provision of the Agreement, somehow reference a type of legal proceeding that would include the dispute before us.  Neither party had useful insight.  Nor does the venue provision itself have any clear function but to provide for a forum in courts in Iowa, as the provision simply states that "any legal proceedings under Subps. i or ii above shall be in the State of Iowa."  *Id.*  Although not thoroughly briefed, we can comfortably recognize that this venue provision does not appear to forbid venue in, e.g., a federal court in Iowa, and might not forbid venue anywhere.  Given these significant ambiguities, we conclude HTS failed to carry its burden of proving the venue is improper and deny its motion to dismiss on this basis.

C.    **Rideway pled sufficient facts to state a claim against and establish personal jurisdiction over Transport**

Rideway claims that HTS and Transport "jointly operate both as a motor carrier and as a freight broker business" and "promote themselves as a singular business operation with both freight brokering/logistics and drivers." DI 20 at ¶ 4. In this paragraph, Rideway refers to HTS and Transport's joint business operation as "Hawkeye Transportation." *Id*. Below that, Rideway's claims respecting the FreightGuard report all refer to Hawkeye, which is presumably synonymous with "Hawkeye Transportation." Nowhere in the complaint does Rideway claim that HTS, or Transport, was the sole entity who submitted the FreightGuard report. Rather, as written, the complaint alleges the entity Hawkeye Transportation (encompassing both HTS and Transport) committed the allegedly tortious conduct and false advertising.

We thus do not agree with Transport's suggestion that Rideway failed to make allegations that Transport engaged in tortious conduct or false advertising. Read in the light most favorable to Rideway, Rideway alleges that both HTS and Transport, as one entity referred to as Hawkeye Transportation, committed such conduct. And while the FreightGuard report is listed as being submitted by someone working for HTS, the address listed for this submission is Transport's principal place of business — which is different than HTS's undisputed principal place of business. The companies also share a website. Moreover, though it is true that the Agreement lists just HTS as the party to the contract with Rideway, it is unclear at this point whether HTS and Transport effectively operate as a single entity, such that HTS's signature could still bind Transport to the agreement. In our view, Rideway has pled sufficient facts to establish that HTS and Transport operate jointly, such that its claims stemming from the FreightGuard report concern conduct by both defendants. We thus deny Transport's motion to

18

dismiss on this basis.

Similarly, we conclude that Rideway has pled sufficient facts to establish personal jurisdiction over Transport.  Plausibly pleading that HTS and Transport are one entity, Rideway has pled enough facts to establish the defendants committed intentional torts which were felt by Rideway in, and expressly aimed at, Pennsylvania.  This satisfies the *Calder* effects test. *Hasssan*, 114 F.4th at 187 (citation omitted).  Accordingly, we deny Transport's motion to dismiss on this ground.

V.    **CONCLUSION**

Dismissal of this matter is warranted because Rideway's claims fall within the scope of the arbitration provision contained within the governing Agreement.  Because we conclude that Rideway has pled sufficient facts to state a claim against Transport with respect to the alleged defamatory statements and to indicate that HTS and Transport operate jointly, dismissal of the entire case is appropriate.  Presumably because Rideway has taken the view that HTS and Transport are intertwined, Rideway conceded at oral argument that dismissal of HTS due to the arbitration provision would require dismissal of the entire case.  Moreover, because no party has requested a stay pending arbitration, the FAA does not require us to issue a stay.  *See Smith v. Spizzirri*, 601 U.S. 472, 474, 478 (2024).  Thus, this case should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, and HTS's motion to dismiss on this basis is therefore granted.  We deny dismissal on all other grounds.